[No. 1756.]

## Antony Walker v. The State.

1. Practice — Evidence.— Objection that a State's witness was permitted to testify that his wife and daughter informed him that the defendant told them that "this will be the last time that the witness would go with the deceased to arrest W.," is obviated by the fact that the wife and daughter had, themselves, at a previous stage of the trial, testified to the same fact, and no injury to the defendant appears to have resulted under the facts in proof.

2. Same — Charge of the Court. — The same witness, having on several occasions, and once under oath, denied that he knew who committed the offense for which the defendant was being tried, and, being called upon to explain the contradiction, recited, as part of his explanation, the statements made to him by his wife and daughter as to the defendant's declarations to them. *Held*, that the evidence was competent for the purpose of explanation; and further, that if, under the circumstances of this case, there existed any probability that the jury would consider the evidence in any other light than as explanatory matter, it was incumbent on the accused to request a proper controlling charge. Note circumstances under which it is *held* that no right of the accused was periled by the admission of the evidence objected to.

3. Same — Impeaching Testimony.— When a witness denies, or fails to remember, that, on former occasions, he made statements inconsistent with his testimony on the trial, evidence that he did make such statements is admissible upon the establishment of a proper and sufficient predicate. But such rule cannot be invoked in a case where the witness, on the stand, admits that he made the statements imputed to him. The witness in this case admitted that he made the contradictory statements imputed to him, and for that reason the trial court did not err in rejecting his written evidence before the jury of inquest, offered by the defense as impeaching testimony. See the opinion *in extenso* on the question.

4. The "Rule"— Sequestration of Witnesses.— The enforcement of the "rule" sequestering witnesses is a matter so far committed to the discretion of the trial court that its action will not be revised by this court unless an abuse of that discretion, to the injury of the accused, be made manifest.

5. Practice — Evidence.— It was one of the theories of the defense that the main witness for the State was the party who committed the offense. Such theory finding some support in the testimony, it was competent for the State to introduce any evidence that would tend to refute it. The trial court, therefore, did not err in permitting a State's witness to testify to the intimate personal and business relations existing between the deceased and the main State's witness at the time of the death of the former.

6. Same — Assignment of Error recites that "the court erred in its charge to the jury; and the charge of the court is upon the weight of evidence." The bill of exceptions taken to the charge, and the objection as made a ground in the motion for new trial, are equally obscure. *Held*, insufficient to point out any error complained of. But note the court's commendati  of the charge as given by the trial judge.

7. Practice — New Trial.— When the defendant's motion for new trial was called for hearing, the defendant asked a postponement in order to secure

the attendance of two witnesses who had been subpœnaed to prove miscon-
duct of jurors. The trial judge explains his refusal to postpone as follows:
"One of the witnesses had been excused by counsel for the defendant, and
both of the witnesses had been in attendance on the court in obedience to
the subpœna, and had interviews with the counsel for the defendant, and
the counsel for the defendant failed to take their affidavits." *Held*, that,
under such circumstances, the court properly overruled the motion to post-
pone. Note the opinion for absent testimony *held* not to be of such charac-
ter as, in any event, would have authorized the award of a new trial because
of misconduct of the jury.

8. MURDER — FACT CASE.— See the statement of the case for evidence *held* suf-
ficient to support a capital conviction for murder.

APPEAL from the District Court of Harrison. Tried below before
the Hon. A. J. Booty.

The indictment charged the appellant with the murder of William
Henry, in Harrison county, Texas, on the 20th day of November,
1883. His trial resulted in his conviction of murder in the first
degree, and he was awarded the death penalty.

Doctor J. H. Taylor was the first witness for the State. He
identified the defendant as Antony Walker, and testified that he
knew William Henry in his life-time. He was summoned to see
Henry on the night that he was said to have been shot, but did not
see him until next morning, which was after death. Henry's death
resulted from gunshot wounds, of which there were seven in his
body. Two bullets entered the right arm between the elbow and
shoulder, four entered the back to the right of the spinal column,
and the remaining one struck and broke the spinal column. These
wounds were inevitably fatal and unquestionably produced the death
of William Henry. The body of the deceased, when the witness
saw it, on the morning of November 21, 1883, lay in his house, in
Harrison county, Texas, some four or five miles distant from the
house of the witness. It was the opinion of the witness that the
fatal shot was fired from a point some twenty or thirty feet distant
from the deceased.

Cross-examined, the witness stated that the bullet holes in the
body of the deceased were of about the size that "blue whistlers"
would make. It was possible that a six-shooter would make such
holes. The bullets ranged diagonally through the body. One
passed out of the body under the left nipple.

Austin Warren was the second witness for the State. He testi-
fied that he knew the defendant. He also knew the deceased, who,
on the 12th day of November, 1883, was killed in Harrison county,
Texas, at the sweet gum pond. At about 9 o'clock on the night

of his death the deceased, with Irvin Warren, Mose Hale and the witness left the house of the deceased to go to the house of Henry Brown to arrest one Peter Washington, for whom the deceased had a warrant. Washington was charged with the theft of a bale of cotton from the deceased about a year before, and for that length of time had been " on the dodge."

Leaving the house of the deceased, the party went to the house of Henry Brown, Washington's father-in-law, but failed to find Washington. Thence the party went to the house of Washington's uncle, a half mile distant from Brown's, and made a fruitless search for their man. They then made a like fruitless search of the house of Washington's cousin, and started on their return to the house of the deceased. They had progressed about two and a half miles towards the house of the deceased, and reached a point near a sweet gum pond, which lay on the left hand side of the road, when a gun was fired from bushes on the right hand side of the road, about thirty-six yards distant from where the deceased was walking. The deceased staggered and fell, and exclaimed: " Boys, I am shot! Woe! Woe!" Witness thereupon fired towards the point in the bushes from which the fatal shot was fired. Witness saw the flash of the assassin's gun, and heard a noise in the bushes. Witness then ran to the house of Irvin Warren, which stood but a short distance from where the shooting occurred. Witness recapped his gun at Irvin's house. While at his house Irvin Warren seemed frightened and ran under his wife's bed. Witness and Irvin remained at Irvin's house about thirty minutes, and then went to Henry's house and told Mrs. Henry that her husband had been shot. Mrs. Henry, Irvin Warren and witness then went to where Mr. Henry was, and undertook to carry him to his house, but upon his complaint that the torture of such transportation was beyond his endurance they laid him down, procured a hack from his house, and in the hack conveyed him home. On arrival at home Mrs. Henry requested Irvin to go for the doctor, which, being afraid, Irvin refused to do. The witness refused the same mission for the same reason. Mrs. Henry then asked Alex. Wabbington to send his little step-son, which Alex. refused to do because the boy did not know the way.

On Monday night, the night of the assassination, Mr. Henry sent for the witness to come to his house. Witness went by Mose Hale's house, and got Mose to go with him. When witness and Mose reached the house, Mr. Henry told them that they must go with him to arrest Peter Washington; that he had a warrant to make

the arrest, which he received from the sheriff, and he was author-
ized to deputize parties under it, and that he deputized the witness
and Mose Hale, and that they must go with him. Mr. Henry
armed himself with a pistol, and gave witness his shot-gun, which
was then unloaded. Witness loaded the gun with squirrel shot,
using yellow paper wadding, in the presence of Mr. and Mrs. Henry
and Mose Hale. Mr. Henry gave Mose Hale a rope with which to
tie Washington in the event of his capture. Being thus equipped,
the party named went to the house of Irvin Warren, about three
hundred yards distant, and called him out of bed. Mr. Henry then
told Irvin that he deputized him to assist in the arrest of Peter
Washington. The party as thus constituted then proceeded to
make the search for Washington, with the results stated.

When the fatal shot was fired from the bushes, the witness and
Mose Hale were walking along the road together, about forty yards
in the rear of Mr. Henry and Irvin Warren. When the witness and
Irvin got to Irvin's house after Mr. Henry was shot, the witness
asked Irvin how they could get to Mr. Henry's house. He replied
that they could reach it by going across the field. Irvin then dis-
charged his pistol through a crack in his house, and he and witness
ran across the field to Henry's house. Irvin knocked at the door
and called Mrs. Henry. He was still very much frightened, and as
soon as the door was opened he ran into the house and under a bed,
and then into another room and under a lounge, from where he
came only when ordered by Mrs. Henry. Witness then told Mrs.
Henry that her husband had been shot down at the sweet gum
pond. Mrs. Henry did not ask who shot her husband. She did not
ask Mr. Henry, when she got to him, who shot him, nor did Mr.
Henry tell her or any one else who shot him. He only groaned
when witness, Irvin and Mrs. Henry got to him; said that he was
shot through the bowels, and asked his wife to pray for him. Wit-
ness was with Mr. Henry until he died.

The witness saw the defendant early on Tuesday morning, the
day after the murder of Henry, at Mrs. Henry's house. He then
had a sack on his back. He, the defendant, went to town and got
the coffin in which Mr. Henry was buried. The witness next saw
the defendant on the following Thursday, at a church. He was
then running through a pine thicket. He, defendant, saw a horse,
dodged, and then stopped. Witness called to him to join him and
his party; that he need fear no one present. Defendant came up
to the fire, apparently much excited, and warmed his hands. De-
fendant then requested that if Mr. Bass should come to the fire he

should be told that he, the defendant, had not been seen.  He then left, going in the direction of Mr. T. Lowery's house.  He was then being trailed by dogs.  The parties at the church with the witness on this occasion were Isaac Caraway, Sandy Caraway, George Williams, Milton Warren, Peter Andrews and Peter Gardner.

Cross-examined, the witness stated that Mr. Henry was killed on Monday night.  He and Irvin Warren went to town that day, together.  Mose Hale did not go with them to town that day.  The first that witness saw of Mr. Henry on that day, Mr. Henry was coming towards his, witness's, house, where the witness and Mose Hale were at the time.  Mose Hale, Irvin Warren and witness were arrested on the Wednesday after the killing; for what, the witness could not say, unless it was upon suspicion of being concerned in the murder of Henry.  They occupied separate cells in jail for fifteen days, and were not released until they went before the grand jury.  Mose Hale and the witness, who were walking together, were forty yards behind Irvin and Mr. Henry when the fatal shot was fired.  Witness had a gun in his hand at the time that Mr. Henry was shot.  Henry Brown, Peter Washington's father-in-law, lived on the road leading by the sweet gum pond to Mr. Henry's house.  He owned a double-barreled shot-gun.

The next witness for the State was Moses Hale.  His testimony, touching the preparation for and the search of Peter Washington, the return to the sweet gum pond, the killing of Henry, and the flight of himself and Austin and Irvin Warren, from the scene of the shooting, was essentially the same as the testimony of the witness Austin Warren.  He testified in addition that he saw the defendant on the Wednesday after the killing, at Mrs. Henry's house.  He then employed the witness to help him haul some cotton, corn, meal and tools from the gin-house to the residence of Mrs. Henry.  He was then working his horse and Mrs. Henry's mule.  Witness saw the defendant again the next day.  He was then running.  He appeared very much excited and asked witness if he had seen Ben Bass.  Witness asked him why he was running from Bass, and he replied that he had promised Bass some tax money that day and did not have it.  Witness replied that Bass called on him for taxes, but that he did not run.  Defendant left in a "crow-hop"— a gait between a fast and a slow run.  Witness saw the flash of the gun when the fatal shot was fired and heard the noise made in the bushes at the time.  Witness, very much frightened, ran off through the woods, and did not go to Mr. Henry's until next day.

Cross-examined by the defense, the witness stated that Mr. Henry

was shot between 11 and 12 o'clock on Monday night. The moon was under a cloud at the moment. Austin Warren had Mr. Henry's gun, Irvin Warren had a pistol, and the witness had a piece of rope, when the fatal shot was fired. The witness supposed that the defendant was employed by Mrs. Henry to haul the articles named, on Wednesday. He paid witness twenty-five cents for his services.

Ed. Williams testified, for the State, that about a week before the killing of Mr. Henry, the defendant came to his, the witness's, house to borrow his gun for the purpose, he said, of killing some hogs he had purchased from Adam Carraway. Witness loaned him the gun, which was a double-barreled shot-gun, in good shooting order. Defendant did not return the gun to the witness, but the witness recovered it from the sheriff after the defendant was placed in jail.

Jane Watson was the next witness for the State. She testified that the defendant came to her house on the evening of the killing, before it occurred, and when the sun was about an hour and a half high. He asked for the witness's husband. Witness told him that her husband was not at home. He then said that he wanted some buckshot. Witness gave him none. He then left, going in a direction directly opposite from where he lived. He then lived about a fourth of a mile west of the witness's house.

On cross-examination this witness testified that she did not and had never harbored ill feeling against the defendant, notwithstanding that individual, about six months prior to this trial, administered to her a severe thrashing because she complained of his whipping her crazy sister, who was then in his charge.

Sarah Warren, the wife of Irvin Warren, was the next witness for the State. She testified that she and her husband lived about a quarter of a mile distant from the house of the deceased. She saw the defendant between 3 and 4 o'clock on the evening that Mr. Henry was killed. He was then standing at Mr. Henry's gate, talking to Mrs. Henry. She saw the defendant again that night. He came to her house looking for Irvin Warren, just as she was preparing to go to bed, which was after Irvin had gone off with Mr. Henry, Austin Warren and Mose Hale. This was about 9 o'clock. The witness was then talking to the children, and quarreling because Irvin had gone off. The defendant stepped to the door and asked what the witness was quarreling about. He then pushed the door open, went to the fire, sat down, pulled off his shoes and proceeded to warm his feet. He then asked where Irvin was. Witness asked him if he did not meet Irvin and the others. He

replied in the negative. Witness then told him that Irvin, Mr. Henry, Austin Warren and Mose Hale had just gone up the road, and that if he, defendant, had come down the road, she could not understand why he did not meet them. Witness told the defendant that the party had gone to arrest Peter Washington. Defendant then said: "Irvin Warren will be sorry for this night's trip if he don't mind."

The house of the witness was situated about one hundred and fifty yards distant from the place where Mr. Henry was killed. The night of the murder was a very cold one. Irvin Warren was in bed when Mr. Henry, with Austin Warren and Mose Hale, came for him. After the defendant left her house on the night in question, the witness heard some one breaking brush. She thought at the time that the noise was made by cows trying to force the cow-pen. Some time after that, the witness heard four distinct gunshots. Soon after these shots were fired, Irvin came running home at full speed. He fell at the doorstep and called to the witness to open the door. Witness opened the door, and Irvin, fearfully frightened, ran under the bed, saying that somebody had shot Mr. Henry at the sweet gum pond. Witness remarked: "I told you, Irvin, that you would be sorry for going after Peter Washington." After the shooting the witness heard some one running up the road towards Henry's house. Henry's house stood about fifty yards from the road. While at the witness's house that night, the defendant said: "This is the last time he (meaning Irvin Warren) will have the pleasure of going with William Henry."

Cross-examined by the defense, the witness said that Irvin did not tell her who shot William Henry. On the Sunday following Mr. Henry's death, the witness told Mr. Perry and Mr. Russell that the defendant came to her house on the night of the killing and pulled off his shoes and warmed his feet. The witness did not go to sleep that night from the time that Irvin left with Mr. Henry, Austin and Mose, until she heard the reports of the guns. When the defendant left her house the witness closed the door and windows. Irvin Warren and the defendant had a difficulty about a plow sometime before the killing.

Lizzie Warren, the daughter of Irvin Warren and the witness Sarah Warren, was next called to testify by the State. She reiterated, in substance and effect, the testimony of her mother, and stated in addition that when, on the night of the shooting and before it occurred, the defendant left her mother's house after warming his feet, etc., she, the witness, followed him out of the house and saw

him take a gun from the corner of the house on the outside, which he took off with him in the direction of the road. A few minutes later the witness heard the breaking of brush or some like sound, and, somewhat later, four distinct gunshot reports. These reports were followed by the noise of some one running up the road towards Mrs. Henry's. This was followed by the events related by Sarah Warren.

On her cross-examination, the witness stated that she knew of a difficulty between Irvin Warren and the defendant about a plow, which occurred in the field a short time prior to this killing. She was positive that the defendant had a gun at her mother's house on the night of the killing, because she saw it. She denied that she had ever told Mr. Perry or other person that the article she saw the defendant take from the corner of the house might have been either a gun or a stick.

Irvin Warren was the next, and the most important, witness for the State. In substance he testified that on the night of Monday, November 12, 1883, the deceased, accompanied by Mose Hale and Austin Warren, came to the house of witness after he had retired, and told him to get up and accompany them for the purpose of making the arrest of Peter Washington. Witness went with the party to the houses of Henry Brown and others, which they searched unsuccessfully for Washington, and started on their return. They had reached the sweet gum pond, a point within three or four hundred yards of the deceased's house, when the deceased was fired upon by a man who stood in a "blind," about twenty-five steps from the road. Witness and the deceased were at this time walking together, about forty yards in advance of Mose Hale and Austin Warren, the witness being on the right of the deceased. When the shot was fired the deceased fell up against the witness and exclaimed: "I am killed!"

Looking towards the blind from whence the shot was fired, immediately the witness saw the defendant standing in full view, within three or four feet of the blind. He held his gun in his hands, the muzzle pointing downwards. He stood thus but a few moments, when he turned and ran into the bushes. The witness recognized him distinctly. That man was the defendant and none other. The witness, much frightened, discharged his pistol twice in the direction of the defendant's flight. Austin Warren discharged his gun in the same direction. The witness described his conduct at his own and at the house of Mrs. Henry, after the shooting, exactly as it was described by previous witnesses.

Mrs. Henry did not ask the witness, when he got to her house, who shot Mr. Henry. She did not, after she got to him, ask Mr. Henry who shot him, nor did Mr. Henry tell her or other person, in the hearing of the witness. Witness, Mrs. Henry, Austin Warren, Jane Young and Harriet Carter went to Mr. Henry where he lay in the road. He was alive when they reached him. An attempt to move him by hand was abandoned. The deceased asked his wife to pray for him, saying that he was shot through the bowels and would die. He died about three hours after he was shot.

Cross-examined, the witness stated that when he got home, after the shooting, he did not tell his wife who shot the deceased. Witness was present at Mrs. Henry's house when the justice of the peace, the coroner's jury and other officers arrived. Sheriff Perry and Constable Lewis were present. The defendant was present at the inquest. Witness told no one at that time who shot the deceased. The witness testified under oath before the inquest, and under oath, at that time, stated that he did not see who shot Mr. Henry; that he saw the blaze when the gun fired, but did not know who shot Mr. Henry. Witness had no recollection of what he told Mr. Munden and Mr. Russell on the road to Hallville. Witness at no time told Tim McCray that he did not know who shot the deceased, or that Peter Washington shot him. Witness was in jail, charged with the murder, for fifteen days, and was released after appearing before the grand jury. Austin Warren and Mose Hale were in jail on the same charge during that time. Witness did not tell Austin Warren and Mose Hale that the defendant shot deceased until after he had been before the grand jury. The witness denied that, about four months prior to this trial, he told McFall, in Marshall, that he, the witness, was going to clear himself by turning State's evidence and accusing the defendant. When he fired the fatal shot, the defendant had on a black coat, buttoned closely about his neck, around which he wore a red handkerchief. The space for many yards about was lit up by the flash of the gun, and the witness as readily recognized the defendant as he did on this trial in broad, open daylight.

Re-examined, the witness admitted that he stated on the coroner's inquest that he did not know who shot the deceased. He was then too much frightened to have a very distinct idea of what he did say. But under no circumstances would he then have told the truth, as he was afraid of being killed himself if he did. His wife told him that defendant had said that he, witness, would not again have the pleasure of again going with deceased to arrest Washington, and

that witness would be sorry for that night's trip. Witness was afraid of the defendant so long as he, defendant, was out of jail, and did not tell the truth about the killing until he told it to the grand jury, at which time the defendant was in jail. The witness did not know, when the fatal shot was fired, whether it was aimed at himself or at the deceased, and could feel no security from assassination himself. Witness had no recollection of what he told Munden when that gentleman arrested him. Munden cursed and frightened witness, and threatened to hang him, and witness was afraid to say anything. About six months prior to the killing the witness sold defendant a plow on a credit of two weeks, the plow to revert to witness in case of non-payment. It was not paid for, nor redelivered, and in consequence the witness took the plow back himself. This was the only difficulty that had ever occurred between the witness and the defendant.

Jane Young testified, for the State, that she was at Mrs. Henry's house on Tuesday night. Mr. Henry was buried on that day. The witness spent that night with Mrs. Henry in her room. While witness, Mrs. Henry and Harriet Carter were in the room together, the defendant pushed open the door and walked up to the fire-place where Mrs. Henry was sitting, and took a chair very near to her. The defendant did not knock when he entered the room, nor did the witness know that he was about the place until he came into the room. While in this room, the witness heard Mrs. Henry tell Jennie McFall to take one of her feather beds and make it down in another room for the use of the defendant. Jennie did so and went home. At bed-time all the parties retired,— the defendant to the bed prepared for him in the room next to that occupied by witness, Mrs. Henry and Harriet Carter. These two rooms were connected by a door. About two hours before day the defendant called to Mrs. Henry in a low tone of voice, and said: "Mrs. Henry, come in here; ᵀ    nt to have some serious conversation with you before I go.·    ·. Henry went into the room occupied by the defendant, and re₁    ' there until day, the two talking in a tone so low that witness    distinguish nothing they said. Defendant left after day, but ₁    ·d next day, moved four bales of cotton, and spent that night    s. Henry's house. Witness saw the defendant running by he₁    ᴐ next day. He said that Mr. Bass was after him for taxes.    ·s replied: "Tax? Ah! that won't do." The defendant requ    witness to tell any one that asked for him that she had not sᴇ    m. Soon afterwards some dogs, following the defendant, passe    ·ough the witness's yard.

Defendant groaned and made strange noises in his sleep on Tuesday night. Next morning, witness asked him the reason of his restlessness, and Mrs. Henry, answering for him, said: "Yes, Uncle Antony slept mighty badly."

Cross-examined, the witness said that she was the mother of Mose Hale. The dogs that followed through witness's yard were after the defendant, who went towards Lowery's.

Jennie McFall testified, for the State, that she was at Mrs. Henry's on Tuesday night, and by direction of Mrs. Henry made down a bed in one of the rooms of Mrs. Henry's house for the occupation of the defendant.

Cross-examined, this witness stated that she knew of a difficulty about a plow between the defendant and Irvin Warren, which occurred prior to the killing. She knew that an unfriendly feeling existed between those parties at that time, and that their families did not visit. She knew Irvin Warren's reputation for truth and veracity in the neighborhood, and knew that it was bad.

Howell Lewis was the next witness for the State. He testified that, about fifteen hours after the death of Henry, he went to and examined the blind from which it was said he was shot. A blasted pine tree, to which dead leaves still adhered, and over which some brush had been placed, formed the blind. It lay parallel to, and about twenty-five steps from, the road. The ground in the rear of the blind had been tramped, and indicated that some one had stood there, but the witness could find no tracks or trail leading to or from it. The witness had dogs with him that gave mouth about five steps to the side and a little in front of the blind. The dogs struck no trail within the radius of a quarter of a mile, in which the witness circled. Witness then went to Irvin Warren's house, from whence, as he had been informed, Irvin and Austin Warren had crossed the field to Mrs. Henry's after the shooting. The dogs struck a trail in the field and followed it to Mrs. Henry's house.

Between the blind and the place in the road where it was said Henry received the fatal shot, the witness found a piece of paper which had the appearance of having been fired from a gun. He also found a piece of wadding, which was evidently a fragment of a yellow paper bag, about forty yards down the road from where Henry was said to have received his wound. It had the appearance of having been shot from a gun. The piece of wadding found between the blind and the road was a fragment of the Marshall *Messenger*, a paper published in Marshall, Texas. Witness carried this piece of paper to Mrs. Henry's house, where he found what he be-

lieved to have been a piece of the same paper. The word "Marshall" was formed by putting the two pieces of paper together.

Deputy Sheriff B. R. Bass testified, for the State, that about two weeks prior to the shooting he left word at the defendant's house that he must have his taxes ready by the next time witness called. Witness had never arrested any one for default in the payment of taxes.

L. M. Fisher testified, for the State, that, on the Sunday following the killing, he went to the blind from which it was said Henry was killed. The blind was in the top of a large fallen pine tree, and was breast high to a man. Limbs as large as a man's arm had been broken off and arranged. The ground under the blind was so packed and stamped that the witness could distinguish no tracks. Just beyond the blind there was a pond in which some sweet gum trees grew. Witness waded out to these trees, and on one of them found where a large sized buckshot or pistol ball had glanced. The scar thus recently made was about breast high. A line drawn from the blind to this scar would pass immediately over the point in the road where Henry was said to have received the fatal shot. The road was straight between the point where Henry was shot and the point where Mose Hale and Austin Warren were said to have been when the shot was fired.

York Sessions testified, for the State, that on Tuesday after the Monday night of Henry's death, he met the defendant going to Marshall to procure a coffin for the interment of the deceased. Witness got into the defendant's wagon and returned to town with him. *En route* the witness would tell people of the death of Henry, when the defendant would say: "Hush, don't be telling it; everybody knows it." The defendant is usually a very talkative man, but on the entire trip from Marshall to Henry's house, a distance of ten miles, he spoke to witness but once, and then only to ask for a chew of tobacco. Witness had a small flask of whiskey when he went to town with the defendant on that day, but was not drunk. He was drunk the day before. Witness got into the defendant's wagon before the Taylor farm was reached.

B. Cook testified, for the State, that he was at Mrs. Henry's on Tuesday night after the funeral. He requested Eddie Murrell to stay at Mrs. Henry's that night. Mrs. Henry replied that she did not need him. She did not appear at all uneasy.

Cross-examined, the witness said that he went to town on the day that defendant went for the coffin. He went ahead of the defendant. After witness had passed the Taylor farm he looked back

and saw the defendant alone in his wagon. York Sessions was not then in the wagon with him. If he had been, witness would have seen him.

S. R. Perry, sheriff of Harrison county, testified for the State that he went to the alleged place of killing on the day after it occurred, and found a blind which he described as it was described by former witnesses. On the Sunday after the Monday of the killing, the witness went to the house of the defendant, where, in a loft, he found a double-barreled shot-gun. One barrel was empty. It had evidently been discharged some five or six days before. The State rested.

Dr. Taylor testified, for the defense, that, when he started home from the funeral on Tuesday evening, Mrs. Henry asked him to stay at her house over night. He replied that it was impossible for him to do so, but promised to send Eddie Murrell.

McFall testified, for the defense, that, about four weeks before this trial, he had a conversation with Irvin Warren at the north gate of the court house in Marshall, Texas. He asked Irvin what he had told Mr. Pope and others. Irvin, in reply, told the witness that he was going to swear that the defendant killed Henry. Witness asked why he did not tell that at first. He replied that Mr. Pope was going to take him as a State's witness; that he was going to turn State's evidence and come clear.

Jailor Tim McCray testified, for the defense, that when Irvin and Austin Warren and Mose Hale were first put in jail, charged with the murder of Henry, he asked Irvin who killed Henry. Irvin then said that Peter Washington killed him. After Washington came clear, witness again asked Irvin, and he said that he did not know. After he had been in jail about two weeks, Irvin told the witness that the defendant killed Henry.

J. P. Munden testified, for the defense, that he and W. J. Russell arrested Irvin Warren at Bray's mill, on Thursday after the killing of Henry, and upon the charge of the murder. On the way to Hallville, witness asked Irvin to tell him who shot Henry. Irvin replied that he thought he was shot by Peter Washington. Witness replied: "You know that is a lie. I know myself that Peter Washington was across Sabine river on the night that Henry was killed." Irvin then said: "I know, Mr. Munden, it will make you mad for me to say that Peter Washington killed Mr. Henry, but I must say that I think he did it." Witness got mad when Irvin said that Peter Washington committed the murder, and threatened to hang him.

W. J. Russell, for the defense, corroborated the witness Munden in substance, but thought that something was said about hanging Irvin Warren before he charged Washington with the murder.

Charlotte Young testified, for the defense, that she knew something about a difficulty between defendant and Irvin over a plow, and knew that, at the time of the killing, unfriendly feelings existed between them. The defendant did not visit the house of Irvin Warren.

Hannibal Williams testified, for the defense, that he was in jail at the time that Irvin and Austin Warren and Mose Hale were confined there, and he occupied a cell along with Irvin Warren, which fact was known to Austin Warren. While in this cell, witness heard Austin say to Irvin Warren: "Irvin, you know that we done it; but if we will stick up to what we told them, we will come clear."

Rintha, the wife of the defendant, testified in his behalf that, on the morning of the killing, the defendant left home, saying that he was going hog hunting. He took no gun with him. He returned about sundown, sat up until bed-time and went to bed. Witness went to bed after he did. She woke up next morning before daylight and found the defendant in bed. He did not stay at home on Tuesday and Wednesday nights.

J. M. Case, the justice of the peace who presided at the inquest over the deceased, identified the written testimony of Irvin Warren, taken before that proceeding, from which the defense read in evidence the following sentence: "I saw no blaze of a gun when Henry was killed."

Taz Lowery, for the defense, testified that the defendant came to his house on the Thursday next after Henry was killed. When the witness first saw him he was standing at the lot looking at some hogs. Witness did not know how long he had been there. He asked witness for some money and said something about taxes. He said also that he was afraid he was being followed on account of Mr. Henry's death. Witness advised him that if he killed Henry, to leave; if not, to go back home. Defendant was arrested that night at home.

On the cross-examination of Sheriff Perry (omitted in its proper place) he stated that a person could not be exact as to how long a gun had been discharged. Witness was at Sarah Warren's house on the Sunday after the killing, and saw and had a conversation with Lizzie Warren. She told witness that when the defendant left her mother's house on the night of the killing he took up a gun or a stick, she could not tell which. If a stick, it was about as long as a gun.

Four or five witnesses for the defense testified that the reputation of Irvin Warren for truth and veracity was bad, and that they would not believe him on oath.

The State recalled Irvin Warren in rebuttal, who testified that Austin Warren did not, when the two were in jail, say to him: "Irvin, you know we done it; but if we stick to the tale we told them we will get out." Hannibal Williams occupied the cell with witness. Austin occupied a different cell, and knew that witness and Williams were together. The parties in the two cells could hear each other only by talking very loud. Austin Warren, in rebuttal, corroborated this testimony.

Adam Caraway testified, for the State, that the feeling between Henry, the deceased, and Irvin Warren, in 1881, was very kind and friendly. Irvin was a decided favorite with Mr. Henry, and run Mr. Henry's engine. He could get anything from Henry he wanted.

The reputations of Hannibal Williams and McFall, for truth and veracity, were pronounced bad by several witnesses for the State. The defendant and the principal witnesses against him were negroes.

The motion for new trial raised the questions involved in the opinion.

*W. C. Lane* and *L. P. Wilson*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Hurt, Judge. This is a conviction for murder of the first degree, with the death penalty. There is no brief for appellant. Eight errors are assigned, however, as grounds for reversal of the judgment. These we will consider in the order presented.

I. "The court erred in permitting Irvin Warren to state to the jury that he had been told by his wife and daughter that the defendant had told them it would be the last time that witness would go with Henry (deceased) to arrest Peter Washington."

There are two answers to this supposed error:

1st. Warren's wife and daughter had sworn to the fact that defendant stated to them that it would be the last time that Irvin Warren would go with Henry to arrest Peter Washington; and this was, under the circumstances of this case, very material and important testimony for the State. And conceding, for the argument, that the State did not have the right to prove that the wife and daughter of the witness informed him of this matter, we fail to perceive in what possible manner, under the facts of this case, appellant could have been injured.

2d. The witness Warren had on several occasions, and once under oath, denied any knowledge as to who the murderer was. Those contradictions he was asked by the district attorney to explain, and as a part of his explanation he referred to what his wife and daughter had told him relating to the remarks of appellant. For this purpose clearly this matter was pertinent and relevant. If, however, there had been any danger of the jury using these facts for any other purpose than as explanatory matter, a charge controlling the jury with reference thereto should have been requested. For, in the attitude this question is presented to us, we do not perceive how the jury could have misunderstood the purpose of this evidence; and while it might have been proper for the court to have controlled this evidence by charge, no injury to appellant appears from a failure to do so.

II. " The court erred in not allowing the defendant to read to the jury the testimony of the witness Irvin Warren before the jury of inquest."

As before observed, this witness Warren had frequently denied all knowledge as to who the guilty party was. On the trial, however, he swore that he saw the flash of the gun, which was but a few steps from the road, and that the defendant was, in fact, the person who shot and killed Henry, the deceased. Upon cross-examination he admitted fully that he had on former occasions, and before the jury of inquest, stated and swore that he did not know who had shot Mr. Henry. This being the case, the court did not err in rejecting his evidence taken before the inquest; the rule being that where a witness denies or fails to remember making the statements, evidence that he did make them is admissible, of course under the proper predicates. When the contradictions are confessed, evidently there is no use or purpose for the impeaching testimony; for this work he performs upon himself. It was claimed by counsel for defendant that the witness Warren had not confessed that he had stated that he did not see the flash of the gun. But so much of his testimony before the inquest as showed that he stated that he saw no blaze from the gun was not objected to, and in fact was read to the jury. We have examined carefully the predicate laid by defendant, and have compared it with the testimony of this witness, but fail to find a fact or circumstance excluded, embraced within the predicate, after giving to the predicate a very broad and liberal construction. We find no error in reference to this matter.

III. With regard to this assignment it appears that the rule had been invoked by defendant, and the witnesses sworn and placed

under the rule; that Adam Caraway was introduced by the State, to which defendant objected because he had been in the court room, heard all the testimony, and had never been under the rule.

One theory of the defense was that Irvin Warren murdered William Henry. This could not have been anticipated by the State. Caraway's testimony was for the purpose of meeting this theory, and by reference to the statement of facts it will be seen that no other witness has testified to the facts sworn to by this witness. Under these circumstances it does not appear to us that the learned judge abused the discretion vested in him touching this matter; and unless it so appears to this court, the action of the court below in permitting a witness to be used who had not been under the rule, or who has violated the rule, will not be ground for reversal.

But defendant objected to the testimony of this witness upon the ground of immateriality. In answer to this objection, the record shows some evidence tending to criminate the witness Irvin Warren, and, as before stated, the learned judge informs us that this was one theory of the defense. Under this state of case, any legitimate evidence tending to refute this theory was material. The relation existing between the parties has, we believe, always been held admissible. Were the parties on friendly and intimate terms, or were they enemies?— this is matter of inquiry in a great many murder cases. And let us suppose that defendant had introduced Caraway, and proposed to prove by him that just such relations existed between him and William Henry as are sworn to have existed between Warren and Henry, viz.: — "That their relations were very kind, and that said Warren was a favorite with Henry, and that Henry would let him have anything he, said Warren, wanted, and that said Warren ran the engine for Henry," — would it be insisted that this would not be material testimony? If not, the theory of the defense being that Warren killed Henry, the State could adduce any fact or circumstance to refute this theory which would be admissible for defendant Walker to refute the theory of his guilt. We find no error in this matter.

4th and 5th errors: "The court erred in its charge to the jury; and the charge of the court is upon the weight of evidence." No error of any character whatever is pointed out in the bill of exceptions, motion for new trial, or the assignment of errors. We have, nevertheless, thoroughly examined the charge, and believe it to be an admirable application of the law to the case, and to the whole case. If it is obnoxious to the objection of being upon the weight of the evidence, we have not been able to discover it.

6th error: When the motion for new trial was called for disposition, counsel for defendant moved the court to postpone the motion until the attendance of two witnesses could be had, who had been subpœnaed. The learned judge upon this subject informs us "that Gray, one of these witnesses, had been excused by counsel for defendant, and that both of the witnesses had been in attendance on the court in obedience to the subpœna, and had interviews with counsel for the defendant, and that the counsel for the defendant failed to take their affidavits." Under this state of case the motion to postpone the motion was overruled. In this, we think, there was no error.

But suppose there was error in forcing the parties to take up the motion for new trial in the absence of these witnesses, was the matter relative to which the evidence was desired of such a character as to warrant the court in granting a new trial? Let us look into this matter. After ten of the jurors (all but Staiti and McMillan) had agreed to the verdict rendered, Bray said he would like to know the relative size of defendant and Peter Washington; when the juror Adkins said to Bray he knew him, and he was a small man. It does not appear that Staiti or McMillan heard this, nor, if they did, that it influenced them in finding a verdict against defendant. It is admitted that Bray asked the question after ten of the jurors had agreed to the verdict, he and Adkins being two of the ten. Nor is it insisted that this conversation was heard by any other juror. It certainly did not influence Bray, for he had already made up his verdict. Nor can we infer, first, that Staiti and McMillan heard this conversation, and then infer that they were influenced. It appears to us that defendant was seeking a postponement for the wrong witnesses. Being informed of the conversation between Bray and Adkins, he should have then inquired of Staiti or McMillan, in order to learn, first, if they or either of them heard these remarks, and, second, if they or either of them was influenced thereby. We have been treating this matter upon the hypothesis that such can be made a ground for new trial; which is very doubtful. We find no error in the action of the court in regard to this matter.

7th and 8th errors: Because the court erred in overruling motion for new trial; and because the verdict of the jury is contrary to the evidence. The grounds for new trial are the matters embraced in the assignment of errors above considered, and held by us insufficient to entitle the appellant to a new trial.

Is the verdict supported by the evidence? This is the only ques-

tion remaining for discussion; we having carefully considered all questions presented in the assignment of errors; and the errors assigned embrace all questions presented by the record about which an issue could be made. The remaining question, therefore, is: Does the evidence support the verdict? Looking to the statement of facts, and giving to each and all the evidence a close analysis, we are convinced and satisfied that Antony Walker did, as found by the jury, with express malice kill and murder William Henry. This belief of his guilt rests upon the fact that the witnesses, who were of his own race and color, swore the truth; of which this court is not the judge. And if the appellant in fact be innocent, and suffers the high penalty of the law, to wit, death, he will be the victim of the perjury of his own people; for the record shows that the learned judge presiding awarded to him a trial eminently fair and impartial. We have not confined our investigation to errors assigned by counsel for defendant only, but have searched the record carefully in order to discover if there be any errors committed injurious to the rights of the appellant; but we have found none, and, therefore, it becomes our duty to affirm the judgment. The judgment is affirmed.

*Affirmed.*

[Opinion delivered October 15, 1884.]